UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

Paul Marinaccio, Sr., Accadia Site
Contracting, Inc., and Midway
Enterprises, Inc.,

                              Plaintiffs,

       -v.-                                     1:02-CV-00831
                                              (NPM)

Joseph H. Boardman, in his official
capacity; James B. Cantwell, Steven F.
Lewis, James F. Tynan and Robert E.
O'Connor, in their official and individual
capacities, as employees of the State of
New York, by and through, The New
York State Department of Transportation,

                              Defendants.

_____

APPEARANCES:                         OF COUNSEL:

GRESENS & GILLEN, LLP            JOSEPH J. MANNA
Attorneys for Plaintiffs              JAMES W. GRESENS
Fleet Building
12 Fountain Plaza
Suite 510
Buffalo, New York 14202

OFFICE OF THE NEW YORK STATE    MICHAEL G. McCARTIN
  ATTORNEY GENERAL
Attorneys for Defendants
The Capitol
Albany, New York 12224


Neal P. McCurn, Senior District Judge

<u>MEMORANDUM-DECISION and ORDER</u>

**I.    Introduction**

Plaintiff Paul Marinaccio, Sr. ("Marinaccio") is a contractor and the
president and sole owner of Plaintiffs Midway Enterprises, Inc. ("Midway") and
Accadia Site Contracting, Inc. ("Accadia Site"), both highway and bridge
construction companies (hereinafter referred to collectively as "Plaintiffs").
Marinaccio is also the president and sole owner of Accadia Enterprises, Inc.
("Accadia"), another highway and bridge construction company, which is not a
party to this action.  Marinaccio originally filed this civil rights action in October
2001 against defendants, Joseph H. Boardman ("Boardman"), Commissioner of
the New York State Department of Transportation ("DOT"), Robert E. O'Connor,
Regional Construction Engineer for DOT Region 5, James B. Cantwell,
Chairperson of DOT's Contract Review Unit ("CRU"), and CRU members Steven
F. Lewis and James F. Tynan (hereinafter referred to collectively as
"Defendants").  In March 2004, an amended complaint was filed, with leave of the
court, wherein  Midway and Acadia Site were named as additional plaintiffs.

Presently before the court are a motion for summary judgment by
Defendants and a cross motion for partial summary judgment by Plaintiffs.  Oral
argument was heard regarding the pending motions on January 11, 2005 in
Syracuse, New York.  Decision was reserved.

**II.    Factual Background**

**A.    The Mateer Incident**

On September 14, 1999, Marinaccio and DOT inspector, Dwight Mateer
("Mateer") were involved in an automobile collision at a DOT work site (DOT

1

contract # D257706). Thereafter, Mateer claimed that Marinaccio intentionally slammed the front of his truck into Mateer's truck. Mateer advised DOT Regional Engineer, Robert O'Connor ("O'Connor") of same. Marinaccio was charged with a felony - - third degree criminal mischief -- regarding the collision. He eventually pleaded guilty to disorderly conduct, a violation.

One week after the collision, O'Connor banned Marinaccio from being present at all DOT project sites "until further notice", which included the project sites of four contracts previously awarded to Accadia (DOT Contract Nos. D257706, D257298, D252811 and D257521). See Decl. of Janice A McLachlan, Nov. 10, 2004, Ex. D, Dkt. No.84. On October 19, 1999, after notice was given to Marinaccio, a meeting was held to allow him an opportunity to address the reasons for this ban and determine if it should continue. Marinaccio appeared at the meeting with his counsel and was given an opportunity to be heard. Thereafter, Marinaccio's counsel submitted documents in support of Marinaccio's position. On January 21, 2000, CRU member James Tynan ("Tynan") issued a letter sustaining the ban on all four contracts. The letter stated,

> Marinaccio will be banned from all current [DOT] contracts with
> Accadia Enterprises, Inc. . . . This ban shall expire with the
> acceptance of Contracts D257298, D257521, D257706, and
> D252811. However, should Accadia Enterprises, Inc. be the apparent
> low bidder on future [DOT] construction contracts, then Mr.
> Marinaccio will be requested to appear in front of the [CRU] for a
> determination as to whether Accadia is a responsible contractor.
> Should an award be made, Mr. Marinaccio's conduct on subsequent
> projects will be monitored and reviewed.

McLachlan Decl. at Ex. H. The ban was to extend over the duration of said contracts and applied to Marinaccio personally, not Accadia. Accadia was paid in full on each of those contracts.

2

**B.     The Williams Road Contract**

In March 2001, Midway was the low bidder on a DOT project involving
Williams Road in the City of Niagara Falls (Contract No. D258702). On May 14,
2001, DOT Attorney Marie Corrado ("Corrado") issued a letter to Paul
Marinaccio, Jr., then president of Midway, informing him that a meeting was
scheduled for May 21, 2001 to address the following issues that CRU had with
Midway's bid: Midway's lack of experience with DOT work, the size and nature
of the contract, Midway's connection with Accadia, and the past performance of
Accadia and Paul Marinaccio, Sr. See Decl. of Marie A. Corrado, Nov. 11, 2004,
Ex. D, Dkt. No. 84.

The CRU meeting was held on May 21, 2001 as scheduled.  Corrado was
present, as well as, among others, O'Connor, CRU Chairperson James Cantwell
("Cantwell"), and CRU members Tynan and Steven Lewis ("Lewis"). See id. at
Ex. E.  Although at the time of the meeting, Marinaccio was not yet the owner of
Midway, he was also present at the meeting along with his attorney, James
Gresens. Marinaccio admits that Plaintiffs were given notice of the concerns to be
addressed at the May 21, 2001 meeting and that he and his counsel were given an
opportunity to address DOT's concerns about Midway at said meeting.  Gresens
assured the CRU that Marinaccio would be acting only as an advisor or consultant
on the project. Marinaccio explained that he spent most of his time taking car of
his wife, who sustained a brain injury in a bad car accident three years prior, and
further stated that "I have no intention of going back into the construction
business." Then, after an extended discussion between Marinaccio and O'Connor
about Marinaccio's history and his behavior on DOT sites, Gresens stated, "If you
want something in writing that Paul will not go on the job or talk to an inspector,

3

we'll give that to you." Further, as for the ban in effect for the four previous contracts, Gresens stated, "If you want to continue that, that's not a problem, for this job. He does want to make a livelihood someday. He's not interested in going into business at the moment. So if you want him off this job, I don't think that would be a problem." Id. At this same meeting, Marinaccio claimed that he had a briefcase full of documents that could prove that certain DOT officials were involved in some kind of improper or possibly illegal activity. Defendants thereafter encouraged Marinaccio to cooperate with the DOT Inspector General to expose any type of DOT wrongdoing. Although Defendants claim that Marinaccio refused to cooperate, Marinaccio argues that he offered to show the contents of the briefcase to the CRU members at the meeting but they declined to review same. See id.

On June 5, 2001, the DOT, through the CRU, denied Midway the Williams Road contract (No. D258702) citing the owners' lack of experience. The CRU acknowledged Marinaccio's assurances that he, with his 35 years of experience, would be available as an advisor to the owners. However, the CRU noted its concern that Marinaccio's wife's illness was taking a great deal of his time, and that, nonetheless, even if he were available, Marinaccio's prior history of unprofessional behavior concerned them.

On June 22, 2001, John S. Samaniuk, Director of the Officer of Internal Audit and Investigations for the DOT sent Marinaccio a letter requesting copies of documents or other information which Marinaccio believed supported the claims he made at the May 21, 2001 CRU meeting. See id., Ex. R. Marinaccio issued a letter to Samaniuk on July 3, 2001 explaining that because he was seriously considering a lawsuit against the DOT and O'Connor, the documents and

4

information referred to in Samaniuk's June 22 letter would not be released. <u>See</u>
id., Ex. S.

Midway unsuccessfully challenged the decision denying them the Williams
Road Contract in New York State Supreme Court in Albany County via an Article
78 petition on July 10, 2001. Marinaccio submitted an affidavit in support of the
petition. That Court found that DOT had a rational basis for denying the contract,
citing the owners' lack of experience and/or availability, and DOT records which
indicate that Marinaccio "has been uncooperative, aggressive, verbally abusive
and violent and was actually banned from his company's active [DOT] work sites
due to such conduct." Id. at Ex. H. Plaintiffs did not bring a due process
challenge to the Article 78 proceeding in State Court, nor did they appeal the
Supreme Court's decision.

## C. The Military Road Contract

In August 2001, the DOT terminated its contract with another construction
company for a project at Military Road in Niagara Falls. The surety company for
the project, Kemper Surety ("Kemper"), was left with the obligation of finishing
the work for the Military Road contract (No. D258333). Midway submitted the
low bid to Kemper for completion of the work. Kemper gave DOT an ultimatum
by telling it that Midway would be the completing contractor, or Kemper would go
to its next lowest bidder, and DOT would pay the difference. <u>See</u> Dep. of Nancy
E. Jones, July 16, 2004, 31:14-18, at Ex. T. to Aff. of Joseph J. Manna (hereinafter
"Manna Aff. II"), Dec. 23, 2004, Dkt. No. 92.

On September 14, 2001, O'Connor issued an email to Tynan, and Corrado,
among others, to notify them of Marinaccio's intent to hold a public meeting to let
the Town of Niagara know how Midway will complete the Military Road Project.

5

See Dep. of Robert E. O'Connor, July 14, 2004, 167at Ex. E to Aff. of Joseph J. Manna (hereinafter "Manna Aff. I"), Nov. 15, 2004, Dkt. No. 85. See also Ex. H to Manna Aff. I, Dkt. No. 85. The remaining text of O'Connor's email message is as follows:

> This is outrageous and typical for Mr. Marinaccio. I called Midway's project engineer and informed him that Midway HAS NOT been approved as a subcontractor for Military Road. I further explained that contractors do not call public meetings. That is our job. In years past, Mr. Marinaccio would meet with local officials and propose his own project phasing. We put a stop to that practice. He clearly has learned nothing. I am again reminded of why we here in Region 5 don't want to work with this thug.

Id.

On September 17, 2001, a CRU meeting was held in order to, according to Defendants, determine whether Midway was a responsible bidder. See Corrado Decl. at ¶ 28. However, Lisa Bevilacqua, the DOT Engineer-in-Charge of the Military Road Contract, testified that a meeting was held prior to the CRU meeting, wherein she and O'Connor were present, as well as others, and where it was decided that Midway would be awarded the contract on the condition that Marinaccio be banned from the site. See Dep. of Lisa Bevilacqua, Aug. 31, 2004, 24-30 at Ex. L to Manna Aff. II, Dkt. No. 91.

Marinaccio, who by this time had replaced his son as the President of Midway, was present at the CRU meeting along with his and Midway's attorney, James Manna. Also present at the meeting were DOT attorney Marie Corrado as well as Defendants O'Connor, Tynan and Lewis, among others. See Corrado Decl. at Exs. K & L. The meeting commenced with a discussion of the manner in which the job would be completed, including confirmation that Marinaccio

6

proposed to serve as superintendent.

Earlier in the meeting, Manna stated that Midway did some preliminary planning and spoke with residents concerning the Military Road project. See id. at 5. In response to Cantwell's inquiry regarding same, Marinaccio stated that he has always met with residents on previous jobs, and that he met with Ms. Bevilacqua when he was at the Military Road site and mentioned his intent to hold a meeting with residents "if nobody has any problem." Id. at 19-20. Marinaccio went on to state that "we weren't trying to do anything behind anybody (sic)" and that he "wasn't trying to . . . step on anybody's toes." Id. at 21. Marinaccio also stated " if that is okay with everybody in this room, I still intend to have a meeting." Id. at 22. In response to Cantwell's invitation for comment regarding such a meeting, O'Connor stated that "contractors don't set up meetings, we do," id. at 23, and "[t]here is no other contractor, at least in my experience, has (sic) ever on his own set in motion a public meeting" id. at 24. In reference to the comments from Marinaccio and O'Connor, Corrado noted the DOT's concern that some confusion may exist as to who is in charge and it should be clear to Marinaccio that the Engineer in Charge, in other words, the DOT, is in charge of the project. See id. Addressing this concern, Manna stated,

> We understand the point you are making. We agree with it. If you decide that that's a meeting that you want to have, we'll be happy to organize it. Or not organize it, to be there. However you folks want to do it, if you want to do it. We understand you are in charge and we understand you're calling the shots and if you want us there, great. If you don't, hey, that's okay too. The point that you are trying to make is well taken. We understand that you are in control.

Id. at 25.

Although DOT notified Kemper and Marinaccio's son that the meeting was

7

to be held and that DOT had certain concerns about Midway, Marinaccio did not have notice that Defendants objected to his holding public meetings. See Corrado Decl. at Ex. J. Marinaccio did testify, however, that he had an opportunity to speak at the meeting and present his side of the story uninterrupted. See Dep. of Paul Marinaccio, Sr., 237, at Ex. A to Decl. of Michael McCartin, Nov. 12, 2004, Dkt. No. 84.

On September 25, 2001, an attachment to the completion contract between Kemper and Midway, referred to as "Attachment A", was executed by Corrado for the DOT, Kimberly Steele ("Steele"), attorney for Kemper, and Richard Reinhold ("Reinhold"), Vice President of Midway. Reinhold signed the attachment, with Marinaccio's consent, above the words "signed under protest and with a full reservation of all rights." Am. Compl., Ex. A. The attachment provides, in relevant part, that DOT consents to Kemper contracting with Midway for completion of the Military Road Contract with certain conditions, as follows: First, Reinhold is the sole superintendent of the project. Second, "Midway, its employees and officers will not conduct any public forums concerning this project." Id. Third, Midway agrees to restrict the actions of Marinaccio for the duration of the project, and agrees that Marinaccio will refrain from visiting the job site, contacting DOT employees, contacting DOT consultants or inspectors working on the project, or making any threats, gestures, trespasses or other verbal or non-verbal communication with, or menacing or following any DOT employee, contractor or inspector. See id.

According to Tynan, the CRU members agreed to allow Kemper to contract with Midway as long as Marinaccio was kept away from the site due to his past behavior. See Tynan Decl. at ¶ 36. Tynan also testified that the CRU discussed

8

some of the conditions in Attachment A, including Reinhold's appointment as superintendent and the restriction against public forums. See Dep. of James F. Tynan, July 13, 2004, 80, at Ex. O to Manna Aff. II, Dkt. No. 92. However, DOT attorney Corrado stated that the terms of Attachment A were negotiated by herself as well as the attorneys for Kemper and Midway, and that none of the defendants to this action were involved in same. See Corrado Decl. at ¶ 38. Plaintiffs deny that there was any negotiation, citing Gresens' testimony that Corrado told him the conditions were inflexible and there would be no negotiating regarding same. See Dep. of James W. Gresens, July 29, 2004, 40-49, at Ex. E to McCartin Decl., Dkt. No. 84. Plaintiffs admit that during negotiations of the terms of Attachment A, neither Marinaccio, his attorneys nor any representative of Midway told any DOT representative that Marinaccio's First Amendment rights would be infringed by execution of same. See Ex. F to McCartin Aff. at ¶ 55.

On October 9, 2001, Marinaccio commenced the present suit in the United States District Court for the Western District of New York. Ten days later, Marinaccio moved for a preliminary injunction to enjoin Defendants from continuing restrictions upon him and seeking an order requiring Defendants to provide him with due process. Within one week of Marinaccio's motion, Defendants moved for change of venue to this court. Before deciding the motion to change venue, the District Court in the Western District of New York denied Marinaccio's motion for a preliminary injunction for failure to make the necessary showing of irreparable harm.

On January 11, 2002, Midway filed an Article 78 petition in New York State Supreme Court, Ulster County, seeking declaration that DOT's restrictions upon plaintiff were in violation of state law and enjoining DOT from continuing

9

said restrictions. The DOT filed a motion to dismiss said petition, which was denied based on the State court's finding that, among other things, (1) pursuant to NY Highway Law § 38, the DOT cannot impose restrictions on a corporate officer or debar him from working on DOT projects where, as here, the corporate entity has been found to be a responsible bidder, and (2) the DOT acted arbitrarily and capriciously by concluding simultaneously that Midway was a responsible bidder but its most significant employee was unfit to work on the project at issue. The DPT thereafter appealed to the Appellate Division, Third Department.

In May 2002, Marinaccio went to work on the Military Road project. Later that month, Defendants' motion to transfer venue to this court was granted. On March 13, 2003, the New York Appellate Division, Third Department dismissed DOT's appeal as moot because both the Military Road and Quay Street projects had been completed in full and because the Supreme Court's decision did not hold that DOT had instituted an improper de facto *prospective* debarment. That court also granted DOT's motion to vacate the Supreme Court's judgment below "in light of the fact that [it] ruled on the petition without affording [DOT] an opportunity to file an answer when it was not clear that there were neither factual disputes nor prejudice to respondents in charting such a procedural course[.]" Marinaccio v. Boardman, 303 A.D.2d 896, 897, 755 N.Y.S.2d 346 (App. Div. 3rd Dep't 2003).

### D.    Master's Edge Subcontract - Quay Street Contract

On October 10, 2001, O'Connor informed DOT attorney Nancy Jones that Marinaccio had contacted several people in Region 5, alleging that Master's Edge, a contractor on DOT's Quay Street project (Contract No. D258267), wanted to use Midway as its subcontractor on said project. See Jones Dep., 71-72, at Ex. T. to

10

Manna Aff. II, Dkt. No. 92. On October 12, 2001, Steele, counsel for Kemper, and Gresens, counsel for Midway, notified Jones that Midway wanted to be the subcontractor on the Quay Street project. See Decl. of Nancy E. Jones, Nov. 11, 2004, ¶ 8, Dkt. No. 84. On this same day, Jones issued a letter to Gresens inquiring as to why it was necessary to have Marinaccio on the site as a supervisor. See id. at ¶ 11; Ex. A. The letter, which asked for an immediate response, was sent to Gresens by facsimile at 3:30 p.m. that day. See Ex. I to Manna Aff. II., Dkt. No. 91. Jones states that she sent the letter because she believed that Marinaccio's presence on the site would require approval by the CRU since the same issue had been addressed less than one month earlier regarding the Military Road project. See Jones Decl. at ¶ 10. Although Gresens sent Marinaccio's reply to Jones by facsimile at 5:10 p.m. on October 12, 2001, a Friday, Jones had already left for the day and did not receive same until the following Monday morning. The letter stated Marinaccio's intent to move equipment into place over the weekend in order to begin work on Monday morning, October 15, 2001. Jones received word from DOT officials that Midway employees, including Marinaccio and his son, had arrived at the Quay Street site but, instead of working for Midway as a subcontractor, they were working directly for Master's Edge. See Jones Decl. at ¶ 13. Marinaccio testified that only four or five individuals who were directly associated with Midway prior to working for Master's Edge were working at the site that morning. See Marinaccio Dep., 228, at Ex. A to McCartin Decl. However, Marinaccio's son testified that there were at least seven of them, all receiving the going union rate for their work. See Dep. of Paul Marinaccio, Jr., July 27, 2004, 56-57, at Ex. B to McCartin Decl. Midway also received about $30,000 in rental fees from Master's Edge for the use of its

11

paving equipment. However, according to Marinaccio, Midway also lost about $70,000 because it was not awarded the contract. See Marinaccio Dep., 233, at Ex. A to McCartin Decl.

Ostensibly because Midway's employees were already on the site working directly for the contractor, (a practice which Jones describes as an "end run" around DOT's lawful procedures and section 112 of the State Finance Law), and because Gresens told Jones on October 12, 2001 that the project needed to be completed by October, 20, 2001, Jones considered Midway's request to be the subcontractor for the project moot , and therefore, no CRU meeting was scheduled regarding same. See Jones Decl. at ¶¶ 16-18, Dkt. No. 84. Moreover, DOT never received any further requests from Midway to be the subcontractor for Master's Edge, see id. at ¶ 17, nor did Midway ever seek any further relief in an Article 78 proceeding, although it could have done so, see id. at ¶ 18. However, Plaintiffs deny making an "end run" around DOT's lawful procedures or State law and submit that because they responded to Jones' inquiry immediately as she requested, and were waiting for a response to same, they had no reason to make any further inquiries or file an Article 78 petition, although same would have been moot as the project completion deadline was October 20, 2001. See Jones Decl., Ex. A.

### E.    Route 33 Contract

On March 27, 2003, Plaintiff, Accadia Site, was the low bidder on a DOT road construction project involving Route 33 in the Buffalo region (Contract No. D259306). On May 15, 2003, DOT issued a letter to Marinaccio giving him notice of its concerns regarding Accadia Site working on this project, including its lack of experience with DOT projects or with large projects, as well as DOT's

12

concern regarding Marinaccio's ability to conduct himself in a professional manner, specifically due to the Mateer incident. See Corrado Decl., Ex. N. Dkt. No. 84. The letter also notified Marinaccio that a CRU meeting would be held to address these concerns on May 28, 2003. The CRU meeting was held as scheduled, and present were Marinaccio, his attorney, Gresens, and, among others, Defendants Lewis and Tynan. One issue raised at the meeting regarding Marinaccio's behavior dealt with an apparent altercation between Marinaccio and his nephew-in-law, which occurred across the street from the project limits of the Military Road site, after which the nephew-in-law reported to the police that he was afraid and that Marinaccio had guns in his possession. See Corrado Decl., Ex. O, 7-9. According to Marinaccio, his nephew-in-law, who is a drug addict, was fired after Marinaccio discovered that he stole several pieces of equipment for sale to another contractor. See id. Although Reinhold, Midway's Vice President, testified that Marinaccio threatened to kill his nephew-in-law during this altercation near the Military Road site, see Dep. of Richard C. Reinhold, July 27, 2004, 23-24, at Ex. C to McCartin Decl., Marinaccio claims he never threatened to kill anyone, see Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, ¶ 3, Dkt. No. 93. Marinaccio also states that his nephew-in-law is now in jail for other crimes. See Marinaccio Aff. at ¶ 10.

Also addressed at the CRU meeting was Marinaccio's recent conviction on a gun related charge. See Corrado Decl. at Ex. O, 6, 8-9, Dkt. No. 84. In response, Marinaccio claims that someone else admitted to owning the gun, his conviction is currently on appeal, and the judge in that case issued him a "certificate of relief from disabilities" which ensures that he is eligible for all types of employment without exception. See Marinaccio Aff. at ¶ 6, Dkt. No. 93. A

13

copy of the certificate is part of the record here and reflects that New York State Supreme Court Judge Mario Rossetti issued same to Marinaccio on February 26, 2004. See Manna Aff. II, Ex. W, Dkt. No. 92.

On March 3, 2004, Plaintiffs filed an Amended Complaint in this court, alleging as a basis for their claims, among other things, the refusal by Defendants to award Accadia Site the Route 33 Contract. On April 8, 2004, almost one year after the CRU meeting was held on the Route 33 contract, CRU members Tynan and Lewis, as well as one member who is not a party to this action, issued a letter denying Accadia Site this contract based on, among other things, the aforementioned issues regarding Marinaccio's prior behavior on work sites and his criminal conviction. See Corrado Decl., Ex. Q, Dkt. No. 84. The letter indicates that because Marinaccio stated that he would be on that project 95% of the time, the CRU members found that Accadia Site was not a responsible bidder pursuant to Highway Law § 38, and therefore rejected the contract bid. See id. Plaintiffs challenge the fairness of said determination, noting Tynan's testimony that he did not know whether it was fair that he was a member of the CRU, which denied a contract to Accadia Site, while he was simultaneously being sued for his failure to award said contract. See Tynan Dep., 128, at Manna Aff. II, Ex. O, Dkt. No. 92.

Plaintiffs never instituted an Article 78 mandamus proceeding in State court to attempt to force the DOT to issue a decision on the Route 33 Contract, although they could have done so. Pursuant to State Finance Law § 140, Plaintiffs could have withdrawn their bid within 45 days and had their bid bond returned. However, if Plaintiffs wished to have their contract bid approved, they could not have withdrawn same. On May 25, 2004, Plaintiffs made their first request for return of their bid bond in accordance with State Finance Law § 140.

14

## III.   Procedural Background

The Amended Complaint sets forth six causes of action as predicates to a civil rights claim pursuant to 42 U.S.C. § 1983, as well as pursuant to the New York State Constitution, and five causes of action pursuant to New York State tort law. In Count I, Plaintiffs allege that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution by unlawfully debarring them for working on DOT Contracts, numbered D257706, D257298, D252811, D257521, D258702, D258333, D2582677 and D259306, without affording them a hearing. See Am. Compl. ¶¶ 46-51, Dkt. No. 59.  In Count II, Plaintiffs allege that Defendants' defacto debarment was intentional and malicious and interfered with their freedom of speech and association rights and their right to work and/or earn a living in violation of their substantive due process rights pursuant to the United States Constitution and the New York State Constitution. See Am. Compl. ¶¶ 52-56. In Count III, Plaintiffs set forth a "stigma plus" claim, alleging that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution, when Defendants published false statements about Plaintiffs, thereby stigmatizing them and foreclosing their liberty interests. See Am. Compl. at ¶¶ 57-63. In Count IV, Plaintiffs allege that Defendants violated their right to equal protection pursuant to the United States Constitution and the New York State Constitution by intentionally treating them differently from those similarly situated in retaliation for Plaintiffs' exercise of their First Amendment rights. See Am. Compl. ¶¶ 64-68. In Count V, Plaintiffs "as independent []DOT contractors" allege that Defendants debarred Plaintiffs from publicly speaking about the Military Road project in violation of Plaintiffs' First

15

Amendment rights to free speech under the United States Constitution and the New York State Constitution. See Am. Compl. ¶¶ 69-79. In Count VI, Plaintiffs "as private citizens" allege that Defendants unlawfully conditioned the award of a government contract on Plaintiffs' silence about matters of public concern in violation of their First Amendment rights to free speech under the United States Constitution and the New York State Constitution. See Am. Compl. ¶¶ 80-85.

In Count VII, Plaintiffs Marinaccio and Midway allege a claim against all Defendants for tortious interference with business relations pursuant to New York law. See Am. Compl. ¶¶ 86-90. Marinaccio and Midway also allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law, in Count VIII of the Amended Complaint. See Am. Compl. ¶¶ 91-96. In Count IX, Plaintiffs Marinaccio and Accadia Site allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law. See Am. Compl. ¶¶ 97-102. In Count X all Plaintiffs allege a claim against all Defendants for prima facie tort pursuant to New York law. See Am. Compl. ¶¶ 103-107. Finally, in Count XI, Marinaccio alleges a claim against all Defendants for defamation pursuant to New York Law. See Am. Compl. ¶¶ 108-113.

Defendants now move for summary judgment on the entire Amended Complaint. Plaintiffs move for partial summary judgment on Count V of the Amended Complaint, as well as dismissal of Defendants' waiver and accord and satisfaction defenses to that claim. At oral argument, Defendants consented to a dismissal of the accord and satisfaction defense.

16

## IV.   Discussion

### A.   Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Peck v. Public Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003), cert. denied, 124 S.Ct. 540 (2003). When deciding whether to grant a motion for summary judgment, "a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." See Baisch v. Gallina, 346 F.3d 366, 372 (2d Cir. 2003), citing Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," see Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002), citing Fed. R. Civ. P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. See Peck, 326 F.3d at 337.

### B.   Dismissal of Claims Against Boardman

Defendants argue that Boardman should be dismissed from this action because he lacks the requisite level of involvement for liability on claims pursuant to 42 U.S.C. § 1983. Boardman is named as a defendant to this action solely in his official capacity as DOT Commissioner. As such, only injunctive, not

17

monetary, relief may be awarded to Plaintiffs on their § 1983 claims against him.
See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358 (1991); Quern v. Jordan, 440
U.S. 332, 341, 99 S.Ct. 1139, 1145 (1979); Ex parte Young, 209 U.S. 123, 28
S.Ct. 441 (1908).  In their moving papers, Defendants cite well known precedent
of the Court of Appeals for the Second Circuit which holds that "personal
involvement of defendants in alleged constitutional deprivations is a prerequisite
to an award of *damages* under § 1983." Colon v. Coughlin, 58 F.3d 865, 873 (2d
Cir. 1995) (internal citations omitted) (emphasis added).  District courts in the
Second Circuit have interpreted said language to mean that the personal
involvement requirement does *not* apply to bar actions such as the one here,
pursuant to § 1983 for injunctive relief against a state official.  See, e.g., Shabazz
v. Cuomo, No. 93-CIV-7692, 1996 WL 445363, at *1 (S.D.N.Y. Aug. 7, 1996);
Ramirez v. Coughlin, 919 F.Supp. 617, 623 (N.D.N.Y. 1996); Marshall v. Switzer,
900 F.Supp. 604, 615 (N.D.N.Y. 1995); Tarafa v. Manigo, 897 F.Supp. 172, 173,
n.4 (S.D.N.Y. 1995); DeBerry v. Griefinger, No. 94-Civ.-6898, 1995 WL 514765,
at *2 (S.D.N.Y. 1995); Santiago v. Miles, 774 F.Supp. 775, 792 (W.D.N.Y. 1991);
Brooks v. Taylor, No. 90-Civ.-2312, 1991 WL 67166, at *2 (S.D.N.Y. Apr. 18,
1991).

    In a § 1983 action against a state employee in his official capacity, such as
the one against Boardman here, the relevant standard for liability is whether he
was a "moving force" behind the alleged constitutional violations.  See Shabazz,
1996 WL 445363, at *5, citing Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct.
3099, 3105 (1985).  "Because the real party in interest in an official-capacity suit
is the governmental entity and not the named official, the entity's policy or
custom, must have played a part in the violation of federal law." Hafer, 502 U.S. at

25, 112 S.Ct. at 361-362, quoting Graham, 473 U.S. at 166, 105 S.Ct. at 3105. Therefore, the personal involvement standard cited by Defendants is not applicable here in deciding their summary judgment motion on behalf of Boardman. The court must determine instead whether there is any evidence in the record before it which would create a question of fact as to whether the alleged constitutional violations here occurred due to an official policy or custom of the DOT.

Notably absent from Plaintiffs' opposition papers is any mention of Defendants' motion as it relates to Boardman. In fact, Plaintiffs refer to Boardman in their papers only insofar as they allege that he was aware of Plaintiffs' objection to the public forums language in Attachment A by virtue of its inclusion in the pleadings. At oral argument, counsel for Plaintiffs expanded on this statement, contending that based on the allegations in the Complaint and Amended Complaint in this action, Boardman was aware that a policy or custom existed in the DOT which amounted to a constitutional violation against Plaintiffs, but nonetheless allowed the policy or custom to continue, and failed to act on the information in said pleadings which indicated that an unconstitutional act was occurring. Plaintiffs' allegations alone are not enough to create a question of fact regarding the existence of a DOT policy or custom pursuant to which constitutional violations occurred, much less Boardman's role as a "moving force" behind such violations. For this reason, Plaintiffs' § 1983 claims against defendant Boardman must fail.

Further, Plaintiffs' State law claims must also fail insofar as they purport to allege causes of action against defendant Boardman, or any of the other Defendants in their official capacities. "Whereas a federal court may award

19

injunctive relief against a state official in an official capacity action based on the Ex Parte Young 'exception,' the Eleventh Amendment bars even prospective injunctive relief based on violations of state law." Chinn v. City Univ. of New York Sch. of Law at Queens Coll., 963 F.Supp. 218, 227 (E.D.N.Y. 1997), citing Penhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911 (1984).

For the aforementioned reasons, the motion for summary judgment is granted as to all claims against defendant Boardman, and as to all state law claims against the remaining Defendants in their official capacities.

## C.    Collateral Estoppel - Marinaccio's Criminal Conviction

Defendants contend that Plaintiffs are collaterally estopped from relitigating the issue of whether Marinaccio intentionally collided his vehicle into Mateer's truck because said issue was conclusively determined in a criminal proceeding. This affirmative defense was set forth by Defendants in Paragraph 31 of the Answer to the Amended Complaint.

In order to determine whether to give preclusive effect to a state court judgment, a federal court must apply the preclusion law of said state. See Lennon v. Seaman, No. 99-Civ.-2664, 2002 WL 109525, at *2 (S.D.N.Y. Jan. 28, 2002). In New York, "[c]ollateral estoppel occurs if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." Simpson v. New York State Dept. of Civil Service, No. 02-CV-1216, 2005 WL 545349, at *7  (N.D.N.Y. Mar. 1, 2005), citing Vargas v. City of New York, 377 F.3d 200, 205-206 (2d Cir.2004) (internal quotation marks and emphasis omitted).  Also in New York, "a guilty plea precludes relitigation in a

20

subsequent civil action of all issues necessarily determined by the conviction."
Lennon, 2002 WL 109525, at *3, quoting Merchants Mut. Inc. Co. v. Arzillo, 98
A.D.2d 495, 504 (1984).  Thus, for collateral estoppel purposes, "a guilty plea is
equivalent to a conviction after trial[.]" Lennon, 2002 WL 109525, at *3.

Here, Plaintiffs contend that Marinaccio never admitted to intentionally
causing the automobile collision with Mateer, and therefore they are not estopped
from arguing that the collision was an accident.  It is undisputed that Marinaccio
pleaded guilty to disorderly conduct regarding the Mateer incident.  According to
the New York Penal Law,

> A person is guilty of disorderly conduct when, with intent to cause
> public inconvenience, annoyance or alarm, or recklessly creating a
> risk thereof:
> 1. He engages in fighting or in violent, tumultuous or threatening
> behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes an
> obscene gesture; or
> 4. Without lawful authority, he disturbs any lawful assembly or
> meeting of persons; or
> 5. He obstructs vehicular or pedestrian traffic; or
> 6. He congregates with other persons in a public place and refuses to
> comply with a lawful order of the police to disperse; or
> 7. He creates a hazardous or physically offensive condition by any act
> which serves no legitimate purpose.

N.Y. Penal Law § 240.20 (McKinney 2004).  By the very terms of the statute
defining disorderly conduct, said conduct is intentional, or at the very least,
reckless.  Therefore, the state court judgment of conviction based on Marinaccio's
plea of guilty to such a violation actually and necessarily decided that his actions
during the Mateer incident were intentional or reckless.

As the party against whom preclusion is sought, Plaintiffs have the burden

21

of establishing that Marinaccio did not have a full and fair opportunity to litigate the issue of whether he acted intentionally in state court. See Simpson, WL 545349, at *8. Because Plaintiffs make no argument regarding this second element, the court concludes that Marinaccio did have a full and fair opportunity to litigate the present issue in state court.[1] Therefore, the state court judgment of conviction against Marinaccio on the charge of disorderly conduct precludes any further litigation regarding whether he acted intentionally or recklessly during the Mateer incident, necessarily precluding Marinaccio from claiming that said collision was an accident.

## D.    First Amendment Claims - Counts V and VI

Counts V and VI of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' First Amendment rights under the United States Constitution as well as the New York State Constitution.[2]   Count

---

[1] Plaintiffs only argument against preclusion is that because the parties to this action are not identical with the parties to the state court judgment, the collateral estoppel doctrine does not apply. See Leather v. Eyck, 180 F.3d 420, 424 (2d Cir.1999) ("[c]ollateral estoppel ... means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). However, Plaintiffs misconstrue the caselaw on this topic. It is clear that the important requirement is that the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the prior action, and that whether the party seeking preclusion was a party in the prior action is not relevant. See Carino v. Town of Deerfield (Oneida County, N.Y.), 750 F.Supp. 1156, 1170 (N.D.N.Y. 1990), citing Blonder-Tongue Labs., Inc. v. University of Illinois Found., 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788, 799-800 (1971). ("A requirement of complete identity of parties serves no purpose as long as the person against whom the findings are asserted or his privity has had a full and fair opportunity to litigate the identical issue in the prior action.")

[2] Free speech claims pursuant to Art. I § 8 of the New York State Constitution are subject to the same standard as their counterpart in the First Amendment to the United States Constitution. See Sanchez v. Turner, No. 00-cv-1674, 2002 WL 1343754, at *4, n.4 (S.D.N.Y. June 19, 2002). The right to freedom of assembly guaranteed under the New York State

V is set forth on behalf of Plaintiffs "as independent []DOT contractors" and Count VI is set forth on behalf of Plaintiffs "as private citizens". Although Defendants purport to seek summary judgment on the entire Amended Complaint, at oral argument, counsel for Plaintiffs conceded that they seek summary judgment only as to Count V, and that Count V is alleged only on behalf of plaintiffs Marinaccio and Midway.

Under Count V of the Amended Complaint, Plaintiffs contend that Defendants violated their First Amendment rights to free speech, association and assembly when, as of September 25, 2001, they barred Marinaccio and Midway from conducting any public forums concerning the Military Road project. Under Count VI, Plaintiffs set forth another First Amendment claim, and allege that "*[i]f no ongoing or commercial relationship existed between Marinaccio, Midway and/or Accadia Site and NYSDOT*, defendants unlawfully conditioned the awarding of public and/or government contracts to plaintiffs on plaintiffs' public silence concerning matters of public concern and by interfering with plaintiffs' right to free assembly and association." Amended Compl. ¶ 81 (emphasis added). It appears, therefore, that Count VI is asserted in the alternative, such that if the court is to determine that no commercial relationship existed between Plaintiffs and the DOT, Plaintiffs allege they are still entitled to relief for violation of their First Amendment rights as private citizens.

Defendants' sole argument in support of their motion for summary judgment as to Count V, and in opposition to Plaintiffs' cross motion for summary

---

Constitution, see Art. I § 9, is broader than that right under the First Amendment, but only insofar as the New York Constitution also protects the rights of political parties. See Golden v. Clark, 76 N.Y.2d 618, 634, 564 N.E.2d 611, 621, 563 N.Y.S.2d 1, 11 (N.Y. 1990). Therefore, Plaintiffs claims here will be analyzed under the First Amendment.

judgment, is that they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). In deciding whether Defendants here should be granted qualified immunity, the court must consider whether the facts alleged, when taken in the light most favorable to Plaintiffs, show that the Defendants' conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). If that question is answered in the affirmative, the next step is to determine whether the right was clearly established, in other words, "whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. at 2156. A court may, in cases where it determines that a right was not clearly established at the relevant time, decline to address whether such a right exists. See African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 359 (2d Cir. 2002), citing Horne v. Coughlin, 178 F.3d 603, 606-607 (2d Cir. 1999).

In determining whether a right was clearly established at the time a § 1983 defendant acted, three factors are to be considered:

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

African Trade, 294 F.3d at 360, citing Shechter v. Comptroller of City of New York, 79 F.3d 265, 271 (2d Cir.1996) (internal citations and quotations omitted).

24

Plaintiffs contend that by executing Attachment A, which by its terms conditioned the award of the Military Road subcontract to Midway on, among other things, an agreement that Midway, its employees and officers would not conduct any public forums relating to said subcontract, Defendants violated Plaintiffs First Amendment rights. According to Defendants, the execution of Attachment A did not violate Plaintiffs' First Amendment rights for several reasons. First, Defendants argue, the agreement did not create an adverse employment action against Plaintiffs, as by its very terms Midway was awarded the Military Road subcontract. Second, Defendants claim that it was Kemper who contracted with Midway, not DOT.[3] Third, Defendants contend, Midway was a mere bidder for a DOT contract, and as such can not claim that an adverse employment action took place. Finally, according to Defendants, Plaintiffs waived any First Amendment rights they may have had.

In order to establish a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and that the alleged violation was committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). To establish a First Amendment retaliation claim under § 1983, a plaintiff

> must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999), citing Mt. Healthy City Sch.

---

[3] The court need not devote much time to this argument, as it is clear that a representative of DOT executed Attachment A along with representatives of Midway and Kemper.

25

Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87, 97 S.Ct. 568 (1977). Once such a showing is made, in order to determine "the extent to which a state may regulate the speech of its employees, [the court] must balance 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Morris, 196 F.3d at 109 -110, quoting Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731 (1968). Finally, a defendant will have a valid defense if it can show, by a preponderance of the evidence, that it would have taken the action it did regardless of plaintiff's speech, see Mt. Healthy City, 429 U.S. at 287, 97 S.Ct. 568, or if it can persuade the court that its legitimate interests outweigh the free speech interests at stake, see Pickering, 391 U.S. at 568, 88 S.Ct. 1731.

Here, Plaintiffs argue, and Defendants do not appear to dispute, that the speech at issue - by Midway and Marinaccio regarding the Military Road subcontract - touched upon a matter of public concern, and is therefore, protected speech. See Connick v. Myers, 461 U.S. 138, 147-148, 103 S.Ct. 1684, 1690-91 (1981).

Regarding the third element set forth in Mount Healthy City, Plaintiffs note that the terms of Attachment A are clear proof of Defendants' motivation to suppress speech. Plaintiffs further argue that, although they were not terminated in retaliation for their speech, an adverse employment action nonetheless occurred, satisfying the second element of their First Amendment claim. In support of this argument, Plaintiffs cite caselaw which describes this Circuit's broad definition of an adverse employment action to include a refusal to hire as well as discharge from employment. See, e.g., Morris, 196 F.3d at 110. Nonetheless, Defendants

26

argue, Plaintiffs were not DOT employees, but were instead applicants or bidders for a DOT contract, and as such, were not entitled to First Amendment protection.

The Supreme Court, in Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342 (1996), extended its analysis in First Amendment retaliation cases involving government employees to hold that independent contractors who have a pre-existing commercial relationship with a government entity enjoy First Amendment protection from termination by that entity in retaliation for the exercise of free speech. See id. at 685, 116 S.Ct. at 2352. The Court specifically left undecided the issue of whether independent contractors who are mere bidders or applicants for government contracts enjoy the same protection. Id. It is clear that on September 25, 2001, the date Attachment A was executed, a contractual relationship was created between Midway, including Marinaccio as the President of Midway, and DOT. The character of the parties' relationship to one another prior to the execution of Attachment A, however, is not clear. Prior to September 2001, Marinaccio was awarded other DOT contracts, unrelated to the Military Road project. See Pls.' Statement of Material Fact in Supp. of Cross Mot. at ¶ 4 (admitted). On the other hand, the Military Road subcontract was the first DOT contract awarded to Midway. See Marinaccio Dep., 23, at Ex. A to McCartin Decl.

In order to determine whether Plaintiffs' First Amendment rights were clearly established as of the date Attachment A was executed, the court must determine whether, at that time, Plaintiffs may have been characterized as applicants or bidders for the Military Road subcontract, or as independent contractors with a pre-existing commercial relationship with DOT. Such an inquiry must be conducted based solely the decisional law of Supreme Court and

27

the Court of Appeals for the Second Circuit as of September 25, 2001. See African Trade, 294 F.3d at 360. By that time, Umbehr had been decided but the only Court of Appeals to address the issue left open after Umbehr was the Third Circuit, who declined to extend First Amendment protection to applicants for new contracts. See McClintock v. Eichelberger, 169 F.3d 812, 817 (3d Cir. 1999).

Following Umbehr alone, as it must, Defendants would have this court conclude, as did the Second Circuit in African Trade, that qualified immunity is appropriate here because, as of the date Attachment A was executed, the law did not provide for extension of First Amendment protection to mere bidders for government contracts. See African Trade, 294 F.3d at 360-362. In African Trade, however, unlike here, the question of whether the plaintiffs there could be characterized as having a prior commercial relationship with the defendant was not before that court. See id., 294 F.3d at 358-359. The court here must decide whether, based on the relevant decisional law as of September 25, 2001, it was clearly established that Plaintiffs were independent contractors that had a preexisting commercial relationship with DOT.

The Umbehr Court, in deciding that a preexisting commercial relationship existed, considered the length of the relationship as well as the number and quality of agreements between the parties. In Umbehr, a preexisting commercial relationship was deemed to exist where the respondent had a six-year contract with petitioner County for the provision of trash removal services, which continued uninterrupted and exclusive for the entire six years before the County elected not to renew same in accordance with the terms of the contract. See Umbehr, 518 U.S. at 671, 116 S.Ct. 2342. In McClintock, however, no preexisting commercial relationship was found to have existed where plaintiff and defendants entered into

28

three separate, distinct and unrelated agreements prior to the denial of the contract at issue there. See McClintock, 169 F.3d at 816. In so finding, the court in McClintock distinguished the ongoing nature of the contract involved in Umbehr. See id. At least one district court in the Second Circuit has held, contrary to the Third Circuit Court of Appeals in McClintock, that an independent contractor who is denied a government contract bid in retaliation for its exercise of free speech may state a viable First Amendment claim based on same, see A.F.C. Enterprises, Inc. v. New York City Sch. Constr. Auth., No. 98CV4534, 2001 WL 1335010, at *17 (E.D.N.Y. Sept. 6, 2001). However, that decision was issued only 19 days prior to the execution of Attachment A, and in any event, does not represent the clearly established decisional law of the Court of Appeals for the Second Circuit.

Here, although neither party delineates each and every DOT contract awarded to Marinaccio prior to September 2001, it is clear that those most temporally related to the Military Road contract were not at all substantively related. Unlike in Umbehr, where the contract at issue involved the provision of a particular type of service to a governmental entity for a long period of time, i.e., trash hauling, here Marinaccio and his companies contracted with the DOT to complete separate and distinct road construction projects, which were wholly unrelated to one another. The facts of this case are more similar to those in McClintock where the contracts at issue were awarded sporadically, and dealt with separate and distinct projects. The court is mindful that, as the decisional law of another Circuit Court of Appeal, McClintock may not be considered in determining whether Plaintiffs had a clearly established right at the time Attachment A was executed. Nonetheless, that case illustrates just how obscure the law was at that time regarding the distinction between a mere applicant or

29

bidder for a government contract and a contractor with a preexisting commercial relationship with a particular government entity.

The court finds that no clearly established First Amendment right existed for Plaintiffs at the time that Attachment A was executed. Accordingly, Defendants are entitled to qualified immunity on Count V of the Amended Complaint. Defendants' motion for summary judgment as to Count V is granted and Plaintiffs' motion for partial summary judgment is denied.

Regarding Count VI, the court acknowledges the absence of argument on Defendants' behalf as to the merits of said claim. Defendants do contend, however, that Plaintiffs waived their First Amendment rights. Because this defense may be considered in the context of either Count V or Count VI, the court will address it now.

The Supreme Court has held that constitutional rights way be waived in a civil context. See D.H. Overmyer Co. v. Frick Co., 405 U.S. 174, 187, 92 S.Ct. 775, 783 (1972); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983 (1972). However, after analyzing Overmyer and Fuentes, the Court of Appeals for the Third Circuit held that constitutional rights

> may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and engaged in other contract negotiations.

Erie Telecommunications, Inc. v. City of Erie, Pennsylvania, 853 F.2d 1084, 1096 (3d Cir. 1988). More recently, a district court in this Circuit has decided an issue

regarding contractual waivers of constitutional rights in accordance with
Overmyer, Fuentes and Erie. See Legal Aid Society v. City of New York, 114
F.Supp.2d 204 (S.D.N.Y. 2004). There the court noted that any such waiver must
be made voluntarily, knowingly and intelligently and must be established by clear
and convincing evidence. Id. at 226-227. Moreover, a waiver of a fundamental
right, as here, cannot be presumed or lightly inferred, and courts must indulge
every reasonable presumption against waiver. Id. at 227. Finally, the court
concluded, waiver of constitutional rights is disfavored and must at the very least
be clear. Id.

Here, Plaintiffs cite evidence that their attorney objected to the language in
Attachment A before it was executed, and note that their representative signed
Attachment A under protest and with reservation of all rights. Defendants argue
that the deferential statements made by Marinaccio and his attorney at the
September 2001 CRU meeting support a finding that Plaintiffs waived their First
Amendment rights. Further, Defendants contend that any objections made by
Marinaccio's attorney to DOT attorney Corrado are irrelevant because she is not a
defendant to this action.

Clearly, statements made to a DOT attorney who represents and can legally
bind Defendants must be considered in deciding whether Plaintiffs waived their
free speech rights here. In any event, considering the policy that waiver of a
fundamental right is disfavored, cannot lightly be inferred, and must be very clear,
the fact that Attachment A was signed by Plaintiffs' representative under protest
and with a reservation of all rights weighs against a finding of waiver here.
Accordingly, Defendants' waiver defense must be dismissed.

Defendants have failed to meet their burden of proving that there is no

31

question of fact to be decided at trial regarding Count VI. Moreover, because Defendants consent to dismissal of their accord and satisfaction defense, and because their waiver defense is dismissed regarding the First Amendment claims, Defendants' motion for summary judgment as to Count VI of the Amended Complaint must be denied.

###    E.    Counts I, II & III - Due Process Claims

Counts I, II and III of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' Fourteenth Amendment due process rights: procedural due process, substantive due process, and "stigma plus" claims, respectively. See Am. Compl. ¶¶ 46-63. Plaintiffs also allege violations of the New York State Constitution. See id.[4] The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law". U.S. Const. amend. XIV, § 1. Thus, in order to prevail on each due process cause of action, Plaintiffs must establish that they were deprived of some tangible property or liberty interest. See Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); DeMuria v. Hawkes, 328 F.3d 704, 705 (2d Cir. 2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite

_____

[4] Because the due process rights afforded under the New York State Constitution are broader than those under the Fourteenth Amendment to the United States Constitution, only insofar as the definition of state action is implicated, and because there is no question before the court regarding same, Plaintiffs' due process claims will be analyzed under the federal constitutional standards. See McGovern v. Local 456, Int'l Bhd. of Teamsters, Chauffeurs & Warehousemen & Helpers of Am., AFL--CIO, 107 F.Supp.2d 311, 317-318 (S.D.N.Y. 2000); Rohan v. Am. Bar Ass'n, No. 93-CV-1338, 1995 WL 347035, at *9 (E.D.N.Y. May 31, 1995).

conscious-shocking behavior on the part of the government); McMenemy v. City of Rochester, 241 F.3d 279, 285 -286 (2d Cir. 2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

### 1.    Property Interest

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1351 (2d Cir. 1994), quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). Such an entitlement is not created by the Constitution, but may exist pursuant to a contract or state statute. See Velez v. Levy, 401 F.3d 75, 85 (2d Cir. 2005), citing Roth, 408 U.S. at 577, 92 S.Ct. 2701.

In the Amended Complaint and in their papers, Plaintiffs identify several DOT contracts regarding which they purport to have suffered the deprivation of a protected property or liberty interest. As an initial matter, the court declines to conclude that a deprivation of a property interest may be found regarding the four DOT contracts which were already awarded to Marinaccio and/or his company, Accadia Enterprises, Inc., when Marinaccio was barred from those worksites in relation to the Mateer incident. The record does not reflect any evidence that Plaintiffs suffered a deprivation in relation thereto, as said contracts were already awarded to Accadia Enterprises, Inc., and were paid in full by DOT. The same analysis pertains to the Military Road subcontract, which was actually awarded to Midway, and regarding which Plaintiffs claim no monetary loss.

Moreover, Plaintiffs cannot establish that they suffered the deprivation of a

33

property interest regarding either the Williams Road or Route 33 contracts, or the Master's Edge subcontract. It is clear that New York law does not recognize a vested property interest in the low bid on a public contract. See A.F.C. Enterprises, 2001 WL 1335010, at *13, citing Terminate Control, 28 F.3d at 1343; Stride Contracting Corp. v. Bd. of Contract and Supply, 181 A.D.2d 876, 879, 581 N.Y.S.2d 446, 448 (App. Div. 2d Dep't 1992). Here, it is undisputed that although Plaintiffs were the low bidders on the Williams Road and Route 33 contracts, their bids were rejected by DOT on the grounds that they were not "responsible bidders" pursuant to New York Highway Law § 38. Regarding the Master's Edge subcontract, Defendants admit that no decision was ever made in response to Midway's request that it be awarded same. Therefore, Plaintiffs cannot prevail on a claim for the deprivation of a property interest relating to either the Williams Road or Route 33 contract or the Master's Edge subcontract.

## 2.    Liberty Interest

Plaintiffs contend that a liberty interest was implicated when they were denied DOT contracts and when Marinaccio was debarred from work on DOT contract sites because Marinaccio's reputation was injured as a result of same. Specifically, Plaintiffs contend that due to defamatory statements made by O'Connor, Marinaccio was debarred from the Military Road contract site, Midway was not awarded the Master's Edge subcontract, and Accadia Site's bid for the Route 33 contract was rejected.

Injury to one's reputation, without more, does not amount to the deprivation of a protectible liberty interest under the Fourteenth Amendment. See Walentas v. Lipper, 862 F.2d 414, 420 (2d Dir. 1988), citing Paul v. Davis, 424 U.S. 693, 701-702, 96 S.Ct. 1155, 1160-61 (1976). However, where the damage to one's

34

reputation accompanies the deprivation of a "legal right or status", a liberty interest may be implicated.  See Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004), quoting Abramson v. Pataki, 278 F.3d 93, 103 (2d Cir. 2002).  Therefore, in order to establish a § 1983 liberty interest claim, also known as a "stigma plus" claim, a plaintiff must bring forth evidence of

> (1) the utterance of a statement about [him] that is injurious to [his] reputation, "that is capable of being proved false, and that he or she claims is false," and (2) "some tangible and material state-imposed burden ... in addition to the stigmatizing statement."

Velez, 401 F.3d at 87, quoting Doe v. Dep't of Pub. Safety ex rel. Lee, 271 F.3d 38, 47 (2d Cir.2001), rev'd on other grounds, Connecticut Dept. of Public Safety v. Doe, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003).

Additionally, the alleged utterance must have been made public.  See Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 44 (2d Cir. 1987), citing Roth, 408 U.S. at 575, 92 S.Ct. at 2708.  The Second Circuit has said that the purpose of this "public disclosure" requirement

> is to limit a constitutional claim to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities. In determining the degree of dissemination that satisfies the "public disclosure" requirement, we must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job opportunities. As a result, what is sufficient to constitute "public disclosure" will vary with the circumstances of each case.

Brandt, 820 F.2d at 44.  Thus, in Brandt, where there were questions of fact as to whether statements included in plaintiff's personnel file were likely to be disclosed to prospective employers, the lower court's ruling of summary judgment

on plaintiff's stigma plus claim was reversed. Id. at 46. Likewise, where plaintiff's presence on a list of child abusers would necessarily be viewed by her prospective child care employers, as was required by law, the stigma element of her liberty interest claim was deemed to have been satisfied. See Valmonte v. Bane, 18 F.3d 992, 100 (2d Cir. 1994). However, where there was no evidence that an allegedly stigmatizing remark was communicated to anyone other than plaintiff's administrator, the court, albeit under a qualified immunity analysis, declined to find that plaintiff's rights were violated. See Vega v. Miller, 273 F.3d 460, 461 (2d Cir. 2001).

Regarding the stigma element of this claim, Plaintiffs allege that O'Connor made false statements about Marinaccio to members of the CRU. See Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. First, Plaintiffs claim that at the May 21, 2001 CRU meeting, O'Connor told those present that Marinaccio threatened to shoot and kill DOT employee, Terrence Bender. The transcript of that meeting reflects that O'Connor first stated that he was reading "notes from engineers' diaries which are official documents[]" before making the following statement: "Terry Bender was threatened. Mr. Marinaccio has said, 'I'll go to my gun and I'll get my truck, and I'll shoot you (sic).' I documented that." See Ex. E to Corrado Decl., at 23, Dkt. No. 84. By affidavit, Marinaccio stated, "I deny that I . . . threaten to shoot or kill people. Those allegations are not true." Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, at ¶ 3, Dkt. No. 93. Plaintiffs also allege that on May 28, 2003, just prior to the CRU meeting regarding Accadia Site's bid for the Route 33 contract, O'Connor told members of the CRU and others that Marinaccio engaged in "sex harassment" of an owner. See Ex. G to McCartin Aff. at Response 1, Dkt. No. 84. Although no

36

documentation of same is part of the record now before the court, the transcript of the referenced CRU meeting reveals that O'Connor stated, in response to an inquiry from Marinaccio regarding the number of concerned citizen letters he received, "What comes to mind is the woman you sexually harassed in Fredonia who called the police. That one comes to mind." See Ex. O to Corrado Decl., at 25, Dkt. No. 84. Plaintiffs also claim this statement is false. See Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G to McCartin Decl., Dkt. No. 84. While both of these statements may call into question Marinaccio's "good name, reputation, honor, or integrity", see Roth, 408 U.S. at 573, 92 S.Ct. at 2707, and while Marinaccio denies the truth of each statement, it is doubtful that these communications may be deemed public within the bounds set forth by Brandt because there is no evidence that they were communicated to anyone outside of those who were present at each meeting. Nor do Plaintiffs allege, or cite to any evidence in the record which would suggest, as did the plaintiff in Brandt, that there is a likelihood of public disclosure in order to warrant a denial of summary judgment on this point. See Brandt, 820 F.2d at 44, 45-46.

Plaintiffs also contend that O'Connor made stigmatizing utterances regarding Marinaccio to CRU members via email. In the first email, dated May 24, 2001, which was addressed to Tynan and Brian Browback, DOT Regional Director, O'Connor referred to Marinaccio as "an incorrigible liar" and "a bully." See Ex. B to Manna Aff. II, Dkt. No. 91. In the second email, dated September 14, 2001, which was addressed to Tynan and Corrado, among others, O'Connor stated, regarding Marinaccio, "I am again reminded of why we here in Region 5 don't want to work with this thug." See Ex. H to Manna Aff. I, Dkt. No. 85. Again, Plaintiffs have alleged the falsity of these statements. While no evidence

37

of public disclosure exists regarding the May 24, 2001 email, it is not
ascertainable from the record whether the September 14, 2001email message was
communicated to anyone other than those involved in the CRU decision making
process, as neither party has identified the relationship of the other recipients of
said message to Plaintiffs or the CRU.[5]  Therefore, questions of fact exist as to
whether the latter email was publicly disclosed.

Finally, Plaintiffs ostensibly contend that certain statements regarding
Marinaccio, which were included in a letter addressed by Corrado to the attorney
for Kemper Surety, were also stigmatizing.  The contents of said letter, dated
September 14, 2001, referred to DOT's concerns relating to the possible award of
the Military Road subcontract to Midway.  See Ex. J to Corrado Decl., Dkt. No.
84.  In one paragraph, Corrado wrote, "According to our records, Mr. Marinaccio,
Sr. was uncooperative, aggressive, verbally abusive and violent at times.  His
behavior was completely unacceptable and highly unusual, culminating in a
decision to ban him from all NYSDOT work sites in January 2000."  Id.  To the
extent Plaintiffs claim the language regarding Marinaccio's ban is stigmatizing,
same cannot be the basis for their liberty interest claim because its truth is not
disputed.  Also, to the extent Plaintiffs claim the statement that Marinaccio is
"uncooperative, aggressive, verbally abusive and violent at times" is sufficiently
stigmatizing, they nonetheless fail to cite any evidence in the record that same was
published to anyone other than Kemper.  Because it is undisputed that Midway
was actually awarded the Military Road subcontract, Plaintiffs cannot base their

---

[5] In addition to Tynan and Corrado, Lisa Sakalian, Richard Springer, and Charlie Stone
are listed as recipients of this message, along with Brian Rowback, who appears to have been
sent a copy of same.  The record does not identify the relationship of these additional recipients
to Plaintiffs or DOT.

38

liberty interest claim on the aforementioned statement.

Regarding the second element of Plaintiffs' "stigma plus" claim, it is unclear what exactly constitutes the "plus", other than termination from government employment or deprivation of property. See Giovanniello v. Goord, No. 04-CV-6129, 2004 WL 2315090, at *3 (W.D.N.Y. Oct. 14, 2004), citing Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989). However, it is clear that the typical consequences of a bad reputation, including the negative impact of same on one's job prospects, does not rise to the level of deprivation of a "legal right or status" required for a "stigma plus" claim. See Giovanniello, 2004 WL 2315090, at *3, citing Valmonte, 18 F.3d at 1001. Where, as in Valmonte, a plaintiff was added to a government generated list of child abusers, which all child care agencies were required to review prior to hiring employees, the court found the "plus" element to have been satisfied, "not merely because of the defamatory aspect of [said list] but because that defamation occur[ed] in conjunction with a statutory impediment to employment." Valmonte, 18 F.3d at 1002. On the other hand, where, as in Sadallah, plaintiffs complained that defamatory comments by a government official about the condition of plaintiffs' business caused harm to the good will in their business, the court held that the "plus" element had not been satisfied as such harm did not occur "in addition to" the defamation, but instead was a "deleterious effect[]" of same. See Sadallah, 383 F.3d at 38-39, citing Doe, 271 F.3d at 47; Valmonte, 18 F.3d at 1001.

Initially, it is clear that Marinaccio's debarment from contract sites, unaccompanied by any property deprivation, cannot sustain the "plus" element of his liberty interest claim. The relevant question, therefore, is whether DOT's

39

rejection of Plaintiffs' bids for either the Williams Road or Rte 33 contracts, or the failure to award Midway the Master's Edge subcontract may satisfy the second element of Plaintiffs' stigma plus claim. The court has already determined that Plaintiffs did not have a protectible property interest in either of the aforementioned contracts or subcontract. Moreover, there is evidence in the record that Plaintiffs did not suffer any business loss as a result of not being awarded the contracts and subcontract at issue. In a signed affidavit, Marinaccio admitted that as of December 2004, his companies "continue to perform millions of dollars in work for public owners throughout Western New York." See Marinaccio Aff., ¶ 7, Dkt. No. 93. Clearly, therefore, Plaintiffs have not suffered the requisite harm to their reputation as is required for success on a liberty interest claim.

Because it is clear that Plaintiffs have not suffered the deprivation of a protectible property or liberty interest in order to prevail on any of their § 1983 due process claims, the court need not address the issue of adequacy of process. Accordingly, Defendants are entitled to summary judgment on Counts I, II and III of the Amended Complaint.

## F.    Count IV - Equal Protection

Count IV of the Amended Complaint sets forth a § 1983 claim as a predicate to a claim for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment to the United States Constitution as well as pursuant to the New York State Constitution.[6]  In the Amended Complaint, Plaintiffs allege

---

[6] Because an equal protection claim under § 1983 mirrors that of its counterpart in the New York State Constitution, see N.Y. Const. art. I § 11, the court will analyze Plaintiffs' equal protection claim under the federal constitutional standards. See Hayut v. State Univ. of New York, 352 F.3d 733, 754 (2d Cir. 2003).

that Defendants selectively and intentionally treated them differently as compared to other similarly situated independent contractors, their owners and employees in contravention of their right to equal protection under the Fourteenth Amendment, and did so with intent to injure Plaintiffs and to punish them for the exercise of their First Amendment rights. See Am. Compl. ¶¶ 65-66. Pursuant to the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Essentially, the Equal Protection Clause directs "that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Cent., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985).

In order to prevail on a § 1983 claim for violation of his right to equal protection of the laws, a plaintiff must establish that the defendant treated him differently compared with others similarly situated. See Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005). In addition, a plaintiff must also establish that there was no rational basis for the selective treatment. See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). Such a claim is commonly known as a "class of one" equal protection claim. See id. Alternatively, a plaintiff prevail on his equal protection claim by showing that "[the] selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Bizzarro, 394 F.3d at 86, quoting LeClair v. Saunders, 627 F.2d 606, 609-610 (2d Cir.1980).

Defendants argue, ostensibly because they would have the court analyze Plaintiffs' equal protection claim under Olech, that no jury could reasonably find that they lacked a rational basis for their treatment of Plaintiffs, citing

41

Marinaccio's criminal conviction relating to the Mateer incident. Plaintiffs, on the other hand, cite evidence of the bitter relationship between Marinaccio and O'Connor, and Defendants awareness of same, ostensibly in support of an equal protection claim based on "malicious or bad faith intent to injure" under LeClair. See 627 F.2d at 609-610. However, before the court addresses the second prong of the equal protection analysis, Defendants must first establish a lack of evidence in the record, which would support a finding that they treated Plaintiffs differently than others similarly situated.

The Second Circuit has held that in order to establish treatment different from others similarly situated, a "plaintiff must show [he] was 'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000), quoting Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).[7] This standard will be met where a plaintiff can show that "his comparators were subject to the same evaluation and discipline standards and that these comparators who went undisciplined engaged in comparable conduct." Rossi v. West Haven Bd. of Educ., — F.Supp.2d —, No. 3:03CV1247, 2005 WL 578655 (D. Conn. Mar. 7, 2005), citing Graham, 230 F.3d at 40.

---

[7] To be sure, Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) and Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) are both cases involving Title VII claims. However, "[t]he elements of an Equal Protection claim and a Title VII claim "are generally the same[ ]", see Simpson v. New York State Dept. of Civil Service, No. 02-CV-1216, 2005 WL 545349, at *22 (N.D.N.Y. Mar. 1, 2005), citing Feingold v. New York, 366 F.3d 138, 159 (2d Cir.2004) (citations omitted). As other district courts have followed the Second Circuit's "others similarly situated" analysis in Title VII cases when deciding a § 1983 equal protection claim, this court will as well. See, e.g., Rossi v. West Haven Bd. of Educ., — F.Supp.2d —, No. 3:03CV1247, 2005 WL 578655 (D. Conn. Mar. 7, 2005); Payne v. Huntington Union Free Sch. Dist., 219 F.Supp.2d 273, 279 (E.D.N.Y. 2002).

Here, Plaintiffs argue that DOT treated them differently than other independent contractors, citing evidence that it never imposed conditions on other contractors seeking DOT contracts similar to those it imposed upon Marinaccio and Midway in Attachment A to the Military Road subcontract. See Tynan Dep., 80:11-81:2, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of Steven F. Lewis, July 15, 2004, 42:9-43:3, at Ex. S. to Manna Aff. II, Dkt. No. 92. Defendants contend that this argument fails because of Marinaccio's criminal conviction related to the Mateer incident, and therefore, Defendants apparently argue, Plaintiffs are more properly compared to other independent contractors with documented criminal convictions, who sought DOT contracts. In support of their argument, Defendants cite a case from the Second Circuit, where the court rejected a Title VII plaintiff's pretext argument because she erroneously compared herself to other employees who were not disciplined by the defendant but had only engaged in verbally offensive behavior, while the plaintiff engaged in a physical fight. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 568 (2d Cir. 2000). This argument might carry weight if the Plaintiffs' equal protection claim were based on Defendants' rejection of Plaintiffs' bids for DOT contracts. In such a case, Marinaccio's criminal conviction relating to events which occurred on a DOT contract site would be  material to the CRU's determination regarding Plaintiffs' bids for future DOT contracts. See Ex. B to Corrado Decl., Dkt. No. 84. In fact, consideration of a bidder's relevant criminal history is required under DOT's policy for determining whether a contractor is the lowest responsible bidder within the bounds of New York Highway Law § 38. See  9 N.Y.C.R.R. § 4.170 (2004). Defendants fail to explain, much less identify evidence which would support a conclusion that, Marinaccio's conviction is material to a decision regarding

43

whether to ban him from speaking publicly about a DOT contract, as provided in Attachment A to the Military Road subcontract. To be sure, Marinaccio's conviction might properly be deemed material to a decision regarding whether he should be banned from the Military Road site, a provision which also exists in Attachment A. However, at the very least, Plaintiffs have identified a question of fact regarding whether they were similarly situated to others who were not subject to a ban on holding public forums. The Second Circuit has noted that "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to a jury." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499, n.2 (2d Cir. 2001), citing Graham, 230 F.3d at 39. While the court also noted that "[t]his rule is not absolute, [], and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met[]", such is not the case here as a reasonable jury could find, based on the evidence cited by Plaintiffs, that Defendants never treated another independent contractor similar to Marinaccio when it banned him from speaking publicly about a DOT contract, and that Marinaccio's prior criminal conviction is not relevant to same.

Returning to the second prong of the equal protection analysis, the court notes that questions of fact remain on either the showing required by LeClair or Olech. Questions remain as to whether Defendants had a rational basis for their treatment of Plaintiffs, for the same reasons as outlined under the similarly situated analysis. While Defendants contend there is no question that Marinaccio's conviction provided a rational basis for their actions, they do not explain the relevance of said conviction to Marinaccio's ability ro speak publicly about the Military Road contract. Notably, it is unclear whether the rational basis

44

issue here is one of fact for a jury to decide or a legal issue for the court to decide. See Bizzarro v. Miranda, 394 F.3d 82, 89 (2d Cir 2005) (finding that an equal protection claim would lie "[i]f a jury could reasonably find that there was no rational basis" for the defendants' action). But see NYC C.L.A.S.H., Inc. v. City of New York, 315 F.Supp.2d 461, 471 (S.D.N.Y. 2004), citing Myers v. County of Orange, 157 F.3d 66, 75, n.3 (2d Cir.1998) (issue of whether, under the Equal Protection Clause, defendants had a rational basis for their different treatment of plaintiffs is one of law for the court to decide, and is not a fact issue for a jury). However, because the grounds for Defendants' rational basis argument is so closely related to the remaining fact issues regarding Plaintiffs' similarly situated argument, the court concludes that the rational basis issue here should also be decided by a jury.

As for the LeClair standard under the second prong of the equal protection analysis, Plaintiffs have also identified questions of fact. Pursuant to LeClair, Plaintiffs can establish an equal protection claim where "[the] selective treatment was based on . . . [among other things, a] malicious or bad faith intent to injure a person." Bizzarro, 394 F.3d at 86, quoting LeClair, 627 F.2d at 609-610. Here, Plaintiffs cite evidence in the record which shows that Defendants were aware of a bitter relationship between Marinaccio and O'Connor, see Tynan Dep., 101:11-24, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of James B. Cantwell, July 15, 2004, 67:2-68:11, at Ex. R to Manna Aff. II, Dkt. No. 92, that they were also aware that O'Connor had bitter feelings toward Marinaccio, see Tynan Dep., 102:1-10, at Manna Aff. II, Ex. O, Dkt. No. 92, and that the relationship between the two had deteriorated, see Cantwell Dep., 65:24-66:23, at Manna Aff. II, Ex. R, Dkt. No. 92. Also, Plaintiffs note Marinaccio's allegation that he complained to O'Connor after

45

the engineer in charge at a project site called Marinaccio a "little dago" but O'Connor never took any steps to investigate same. See Corrado Decl., Ex. E, at 26, Dkt. No. 84. Moreover, Plaintiffs again note that O'Connor referred to Marinaccio as a "thug" in his September 14, 2001 email to Tynan and Corrado. See Ex. H to Manna Aff. I, Dkt. No. 85. Based on this evidence, Plaintiffs have identified a question of fact regarding whether they were treated differently due to a malicious or bad faith intent to injure. Cf. Harlen Assocs., 273 F.3d at 502.

Material questions of fact remain regarding each element of Plaintiffs' § 1983 equal protection claim. Therefore Defendants' motion for summary judgment is denied regarding said claim, set forth in Count IV of the Amended Complaint.

**G. New York State Tort Claims - Counts VII through XI**

    **1. Counts VII, VIII and IX - Tortious Interference With Business Relations**

The first three of Plaintiffs state law claims are as follows: tortious interference with business relations by Marinaccio and Midway (Count VII), tortious interference with prospective advantage by Marinaccio and Midway (Count VIII), and tortious interference with prospective advantage by Marinaccio and Accadia Site (Count IX). See Am. Compl. ¶¶ 86-102. Because in New York, claims for tortious interference with business relations and prospective advantage are identical, the court will conduct its analysis of Counts VII, VIII and IX together. See Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002); Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108 -109 (2d Cir. 1997). See also El Greco Leather Prods. Co. v. Shoe World, Inc., 623 F.Supp. 1038, 1044 (E.D.N.Y. 1985). The elements for this cause of action are "(i) the

46

plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." Lombard, 280 F.3d at 214. See also Goldhirsh Group, 107 F.3d at 108 -109; El Greco Leather Prods., 623 F.Supp. at 1044.

In Count VII of the Amended Complaint, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationships with Kemper and the DOT. In Count VIII, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationship with Master's Edge, insofar as they prevented the award of the Master's Edge subcontract to Midway, resulting in damage to said relationship and a $70,000 loss to Midway. At oral argument, counsel for Plaintiffs further argued that, insofar as the claim for tortious interference with business relations is maintained by Marinaccio, Defendants interfered with his business relations with Midway, and insofar as the claim is maintained by Midway, Defendants interfered with its business relations with Marinaccio. In Count IX of the Amended Complaint, Plaintiffs argue that Defendants interfered with Marinaccio's and Accadia Site's relationship with the DOT by not awarding them the Route 33 contract. Finally, Plaintiffs argue in their memorandum of law, ostensibly as to Counts VII and IX, that Defendants interfered with their business relationship with the DOT, based on Marinaccio's history of performing $85 million in road construction for DOT.

Defendants argue that the only third parties involved in this action are Kemper Surety and Master's Edge, and neither suffered an injury to their respective relationships with Plaintiffs. Moreover, Defendants argue that it had a reasonable and legitimate purpose for its actions based on Marinaccio's prior

47

behavior, and therefore, Plaintiffs cannot establish that Defendants acted improperly.

Initially, the court notes that neither Marinaccio, Midway, nor, to the extent Plaintiffs argue same, Accadia Site, may be considered a third party under Plaintiffs' tortious interference claims as Marinaccio is the owner and/or president of each. Because each entity has identity of interests with Marinaccio, he therefore cannot claim that either is a third-party to prospective contracts or business relations with others. The DOT, however, may be considered a third party for purposes of Plaintiffs' tortious interference claims because Plaintiffs' state law claims are only properly brought against Defendants in their individual capacities. As such, Defendants are necessarily only liable on said claims if they acted outside the authority of the DOT, and therefore, were capable of interfering with Plaintiffs' relationship with the DOT.

Regarding Count VII, there is no evidence in the record that Marinaccio's or Midway's relationship with Kemper or the DOT was injured as a result of Defendants' actions relating to the Military Road subcontract. Defendants are correct that Plaintiffs' award of said subcontract contradicts Plaintiffs' claims that their relationship with Kemper or the DOT was damaged. Therefore, Defendants are entitled to summary judgment on Count VII of the Amended Complaint.

The court concludes, nonetheless, that questions of fact exist regarding the claims set forth in Counts VIII and IX of the Amended Complaint. Plaintiffs have submitted evidence that their relationship with Master's Edge was harmed as a result of Defendants' failure to award them the subcontract at issue, in that Plaintiffs suffered a monetary loss in relation thereto. See Marinaccio Dep., 232:22-233:19, at Ex. A to McCartin Decl., Dkt. No. 84. Moreover, Plaintiffs

48

have also submitted evidence that their relationship with the DOT has suffered as a result of Defendants' actions, insofar as its bids for DOT contracts have been rejected. Regarding the propriety of Defendants actions regarding the Master's Edge subcontract and the Route 33 contract, questions of fact remain for the same reasons as previously outlined in the discussion of Plaintiffs' equal protection claim. Therefore, Defendants' motion for summary judgment as to Counts VIII and IX of the Amended Complaint is denied.

Accordingly, the court grants Defendants' motion for summary judgment as to Count VII of the Amended Complaint and denies the motion as to Counts VIII and IX.

### 2.      Count X - Prima Facie Tort

As their tenth cause of action, Plaintiffs claim that Defendants intentionally and maliciously, with the sole purpose of causing them harm, interfered with their business relationships and/or contracts with DOT, Kemper, and Master's Edge, thereby resulting in "special damages" to Plaintiffs in the form of "loss of income, loss of profits, loss of productivity, loss of future earnings and loss of goodwill in the business community." Am. Compl. ¶¶ 103-107.

In New York, the elements of a claim for prima facie tort are "(1) intentional infliction of harm, (2) causing special damages (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." Discover Group, Inc. v. Lexmark Int'l, Inc., 333 F.Supp.2d 78, 87 (E.D.N.Y. 2004) (citation and quotation omitted). A key feature of a prima facie tort claim is "disinterested malevolence, meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990)

(citation and quotation omitted). "Motives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim." Id. Also, in order to prevail on a claim for prima facie tort in New York, a plaintiff must establish special damages "with sufficient particularity to identify actual losses" and "round sums without any attempt at itemization are insufficient." Discover Group, 333 F.Supp.2d at 87.

Here, to the extent Plaintiffs' claim is based upon the rejection of their bids for either the Williams Road or Route 33 contracts, Defendants have submitted evidence that their actions regarding same were motivated by workplace and public safety in accordance with DOT regulations, and that their decisions were based upon Marinaccio's criminal conviction relating to the Mateer incident as well as Midway's and Accadia Site's lack of experience. Because Defendants have supplied evidence of a motive other than "disinterested malevolence," their rejections of Plaintiffs' bids for the Williams Road and Route 33 contracts cannot be the basis of Plaintiffs' prima facie tort claim. Also, to the extent Plaintiffs base their claim upon Defendants' actions regarding the Military Road subcontract, the claim must fail  because said subcontract was, in fact, actually awarded to Midway, and therefore, no damages may be found. Finally, although Plaintiffs submit evidence that they "probably lost somewhere in the neighborhood of sixty, seventy thousand dollars" due to their not being awarded the Master's Edge subcontract, Marinaccio Dep., 233:10-11, Ex. A to McCartin Decl., Dkt. No. 84, such rounded estimates are not enough to meet the standard required to establish "special damages." For these reasons, Plaintiffs cannot establish a claim for prima facie tort, and accordingly, Defendants' motion for summary judgment as to Count X of the Amended Complaint is granted.

### 3.    Count XI - Defamation

Plaintiffs' final cause of action is a claim for defamation under New York law. Although the Amended Complaint purports to set forth a defamation claim by Marinaccio against all Defendants, at oral argument Plaintiffs conceded that O'Connor is the sole defendant against whom this claim is alleged. Therefore, initially the court notes that Count XI of the Amended Complaint is dismissed against all defendants except O'Connor.

In New York, in order to prevail on a claim for defamation, a plaintiff must establish the following elements: "(1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff." Mills v. Unisource Worldwide, Inc., No. 04-CV-6324, 2005 WL 578167, at *5 (W.D.N.Y. Mar. 9, 2005) (citation and quotation omitted). During discovery, Plaintiffs identified four separate instances of statements made by O'Connor about Marinaccio, which they allege form the basis of his claim for defamation. See Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. These statements include O'Connor's references to Marinaccio as "an incorrigible liar," "a bully" and a "thug" in his email messages of May 24, 2001 and September 14, 2001, respectively.  See Ex. B to Manna Aff. II, Dkt. No. 91.; See Ex. H to Manna Aff. I, Dkt. No. 85. Also included are the statements made by O'Connor at the CRU meetings held on May 21, 2001 (regarding the engineer's notes which alleged that Marinaccio threatened to shoot a DOT employee) and May 28, 2003 (regarding Marinaccio having sexually harassed a woman in Fredonia who called the police). See Ex. E to Corrado Decl., at 23, Dkt. No. 84; Ex. O to Corrado Decl., at 25, Dkt. No. 84.

51

Defendants argue that Marinaccio cannot establish his defamation claim against O'Connor because the proffered statements are not false and defamatory, and because Marinaccio was not injured by them.  First, Defendants argue that Plaintiffs cannot establish the falsity of O'Connor's statement that Marinaccio is a "thug" and "a bully," because said statements were made after the Mateer incident, and Marinaccio was convicted of criminal conduct based on same.  Even if the court were to credit this argument, there are clearly questions of fact regarding the truth of the remaining statements, as Marinaccio has asserted they are false.

Regarding the element of damages, in New York, in order to prevail on a claim for defamation, a plaintiff must prove "special damages," which consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to the reputation by defamation; not from the effects of defamation."  Idema v. Wager, 120 F.Supp.2d 361, 368 (S.D.N.Y. 2000), quoting Matherson v. Marchello, 100 A.D.2d 233, 234, 473 N.Y.S.2d 998, 1001 (App. Div. 2nd Dep't 1984).  Defendants contend that Marinaccio cannot establish that he was injured by the May 2001 email and CRU statements because Defendants have submitted evidence that Midway was denied the Williams Road contract based on its inexperience, not Marinaccio's behavior.  Defendants make a similar argument regarding O'Connor's statements at the May 2003 CRU, noting that there is evidence that Accadia Site was denied the Route 33 contract due to its inexperience.  Finally, regarding the September 2001 email, Defendants contend that no injury may be shown because Midway was awarded the Military Road subcontract.  However, the court need not address these arguments as Marinaccio's defamation claim fails on separate grounds.  The "special damages" requirement in New York demands that a plaintiff fully and accurately define his

52

damages "with sufficient particularity to identify actual losses." Idema, 120
F.Supp.2d at 368. As with the "special damages" element of a prima facie tort
claim, in order to prove special damages for a defamation claim, the submission of
estimates or round figures will not suffice. See id.; Discover Group, 333
F.Supp.2d at 87. Because Marinaccio has failed to submit specific evidence of his
alleged losses relating to O'Connor's statements, he cannot establish defamation
claim, and therefore, Defendants' motion for summary judgment as to Count XI of
the Amended Complaint is granted.

## V.    Conclusion

In accordance with the above, it is hereby ORDERED that:

the motion for summary judgment on behalf of defendant, Joseph H.
Boardman, as to all claims against him is GRANTED;

the motion for summary judgment on behalf of defendants, James B.
Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts
I, II and III of the Amended Complaint is GRANTED;

the motion for summary judgment on behalf of defendants, James B.
Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count
IV of the Amended Complaint is hereby DENIED;

defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert
E. O'Connor, are entitled to qualified immunity as to Count V of the Amended
Complaint, and therefore, said defendants' motion for summary judgment as to
said claim is accordingly GRANTED;

the motion for summary judgment on behalf of defendants, James B.
Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count
VI of the Amended Complaint is hereby DENIED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts VII, X and XI of the Amended Complaint is hereby GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official capacities, as to Counts VIII and IX of the Amended Complaint is hereby GRANTED; and

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, as to Counts VIII and IX of the Amended Complaint is hereby DENIED.

Accordingly, the following claims remain for consideration at trial:

Plaintiffs' claims against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official and individual capacities, pursuant to 42 U.S.C. § 1983 as predicates to claims for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment (Count IV of the Amended Complaint) and their rights to free speech and assembly under the First Amendment (Count VI of the Amended Complaint); and

claims for tortious interference with prospective advantage, pursuant to New York law, against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, by plaintiffs, Paul Marinaccio, Sr. and Midway Enterprises, Inc. (Count VIII of the Amended Complaint), and by plaintiffs, Paul Marinaccio, Sr. and Accadia Site Contracting, Inc. (Count IX of the Amended Complaint).

54

IT IS SO ORDERED.

DATED:    April 19, 2005
          Syracuse, New York

Neal P. McCurn
Senior U.S. District Judge

55